**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| _____ | |
| WAL, Inc. d/b/a Tri-State Automotive Warehouse  : | |
| and KMB/CT, Inc. d/b/a KMB Warehouse  : | |
| Distributors, Inc., individually and behalf of all  : | |
| others similarly situated,  : | Civil Action No. |
| Plaintiffs,  : | |
| v.  : | |
| : | |
| NGK Spark Plug Co., Ltd., NGK Spark Plugs  : | |
| (U.S.A.), Inc., Denso Corporation,  : | |
| Denso International America, Inc.,  : | |
| Denso Products & Services Americas f/k/a Denso  : | |
| Sales California, Inc., Robert Bosch GmbH,  : | |
| and Robert Bosch LLC,  : | |
| : | |
| Defendants.  : | |
| _____: | |

**CLASS ACTION COMPLAINT**

Plaintiffs WAL, Inc. d/b/a Tri-State Automotive Warehouse and KMB/CT, Inc. d/b/a/ KMB Warehouse Distributors Inc., individually and on behalf of a proposed class of direct purchasers of Spark Plugs, bring this class action against Defendants under the federal antitrust laws for treble damages and allege as follows.

**NATURE OF THE CASE**

1.      Beginning at least as early as January 2000, the Defendants – United States and global manufacturers and suppliers of Spark Plugs – violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Spark Plugs sold in the United States and elsewhere at supra-competitive levels.  As a result of Defendants' unlawful conduct, Plaintiffs and the Class members paid artificially inflated prices for Spark Plugs and as a result have suffered antitrust injury to their business or property in violation of the federal antitrust laws.

2.      In the related U.S. Department of Justice Antitrust Division criminal investigation of price fixing in the motor vehicle parts industry, Defendant NGK Spark Plug Co., Ltd. ("NGK"), which is currently the largest manufacturer of spark plugs in the world, producing over 500 million NGK brand spark plugs per year, and Robert Bosch GmbH, the world's largest independent parts supplier to the automotive industry, have been criminally charged and agreed to plead guilty to antitrust violations with respect to Spark Plugs and other products.

3.      Plaintiffs bring this action under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 ("Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 ("Clayton Act"), and assert the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiffs, which are based upon personal knowledge.  Plaintiffs' information and belief are based upon, *inter alia*, the investigation made by their attorneys.

## DEFINITIONS

4.      A "Spark Plug" is an engine component for delivering high electric voltage from the ignition system to the combustion chamber of an internal combustion engine.  It ignites the compressed fuel/air mixture with an electric spark while containing combustion pressure within the engine.  Spark Plugs have a basic manufacturing design composed primarily of a shell, an insulator, a center electrode and an external (ground) electrode.

5.      The "Class Period" is from at least as early as January 2000 through and including the present.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action to recover treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violations of the Sherman Act, 15 U.S.C. §§ 1, 3.

7.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

8.      Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, is found in or transacts business in this District.

9.      The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

10.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Spark Plugs throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

**THE PARTIES**

11.      Plaintiff WAL, Inc. d/b/a Tri-State Automotive Warehouse is a Rhode Island corporation located in Providence, Rhode Island.  WAL, Inc. purchased Spark Plugs directly from one or more of the Defendants during the Class Period.

12.     Plaintiff KMB/CT, Inc. d/b/a KMB Warehouse Distributors Inc. is a Connecticut corporation located in New York and Connecticut.  KMB/CT, Inc. purchased Spark Plugs directly from one or more of the Defendants during the Class Period.

*NGK Defendants*

13.     Defendant NGK Spark Plug Co., Ltd. is a Japanese corporation with its principal place of business located in Nagoya, Japan.

14.     Defendant NGK Spark Plugs (U.S.A.), Inc. ("NGK USA") is a West Virginia corporation with its principal place of business located in Wixom, Michigan.  NGK USA is a subsidiary of, and is owned and controlled by, its parent, NGK.

15.     NGK and NGK USA are hereinafter jointly referred to as the "NGK Defendants" or "NGK."

16.     The NGK Defendants manufactured, marketed, or sold Spark Plugs in (or sold them into) the United States during the Class Period.

*Denso Defendants*

17.     Defendant Denso Corporation ("Denso") is a Japanese corporation with its principal place of business located in Kariya, Japan.

18.     Defendant Denso International America, Inc. ("Denso International") is a Delaware corporation with its principal place of business located in Southfield, Michigan.  Denso International is a subsidiary of, and is owned and controlled by, its parent, Denso.

19.     Denso Products & Services Americas ("DPSA") f/k/a Denso Sales California, Inc. (which was a subsidiary of Denso) is a corporation with its principal place of business in California.  DPSA is a subsidiary of, and is owned and controlled by, its parent, Denso International.

20.     Defendants Denso, Denso International and DPSA are hereinafter jointly referred to as the "Denso Defendants" or "Denso."

21.     The Denso Defendants manufactured, marketed, or sold Spark Plugs in (or sold them into) the United States during the Class Period.

*The Bosch Defendants*

22.     Defendant Robert Bosch GmbH ("Bosch") is a privately held German company with its principal place of business in Stuttgart, Germany.

23.     Defendant Robert Bosch LLC ("Bosch LLC") has its principal place of business located in Farmington Hills, Michigan.  Bosch LLC is a subsidiary of, and is owned and controlled by, its parent, Bosch.

24.     Bosch and Bosch LLC are hereinafter jointly referred to as the "Bosch Defendants" or "Bosch."

25.     The Bosch Defendants manufactured, marketed, or sold Spark Plugs in (or sold them into) the United States during the Class Period.

**DEFENDANTS' CO-CONSPIRATORS AND AGENTS**

26.     The acts alleged in this Complaint to have been done by Defendants NGK USA, Denso International, DPSA and Bosch LLC were authorized, ordered and condoned by their parent companies and the acts alleged to have been done by the NGK, Denso and Bosch Defendants were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

27.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in

furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

28.     Each Defendant acted as a principal or an agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

### INTERSTATE TRADE AND COMMERCE

29.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

30.     During the Class Period, Defendants manufactured, sold and shipped substantial quantities of Spark Plugs in a continuous and uninterrupted flow of interstate and foreign commerce.

### THE U.S. ANTITRUST AND WORLDWIDE INVESTIGATIONS
### INTO PRICE FIXING IN THE MOTOR VEHICLE PARTS INDUSTRY

31.     According to the United States Department of Justice ("DOJ"), the motor vehicle parts investigation, of which Spark Plugs is a part, is the "largest criminal investigation the [DOJ] has ever pursued," both in terms of scope and potential volume of commerce affected by the alleged illegal conduct.

32.     With respect to the United States price fixing investigation, in February 2010, the same month that Japanese and European authorities conducted raids, FBI investigators executed warrants and searched the offices of three Japanese motor vehicle part makers in metropolitan Detroit.  Denso International was among the companies searched.

33.     Commenting on her division's investigation, Sharis A. Pozen, Acting Assisting Attorney General in charge of the Department of Justice's Antitrust Division, stated that "[a]s a result of this international price-fixing and bid-ridding conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  She further

stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

34.     "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

35.     In July 2011, the JFTC raided seven Japanese auto parts makers, including Defendant Denso.  The Japan Times reported that the JFTC "suspects the parts manufacturers had meetings from 2002 or earlier to set parts prices and decided which companies would win contracts before bidding for orders from automakers."

36.     Including Bosch, as of March 2015, 34 companies (and 29 executives) have pleaded guilty or agreed to plead guilty in the DOJ's ongoing investigation into price fixing and bid rigging in the motor vehicle parts industry and have agreed to pay a total of $2.5 billion in criminal fines.

37.     On September 8, 2014, Bosch issued a statement that it had turned itself in to the antitrust authorities in Brazil after an internal investigation revealed it had been operating a Spark Plug cartel with NGK.  On March 31, 2015, the DOJ announced that Bosch had agreed to plead guilty to conspiring to allocate the supply of, rig bids for, and to fix prices for Spark Plugs sold to automobile and other internal combustion engine manufacturers in violation of Section 1 of the Sherman Act.

**SPARK PLUGS**

38.     Spark Plugs manufactured, distributed or sold by Defendants during the Class Period are not functionally distinguishable in any material respect.  Defendants all can, and do, make Spark Plugs for a full range of vehicles and engines.

39.     Spark Plugs are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the motor vehicle manufacturing process, as well as by other manufacturers of internal combustion engines.  They are also installed to replace worn out, defective, or damaged Spark Plugs.

40.     OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S.  For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama and Kia in Georgia.  In addition to OEMs, distributors, such as Plaintiffs, purchased equivalent Spark Plugs directly from Defendants.

41.     When purchasing Spark Plugs, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers.  For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform.  In response, motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years.  Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

42.     During the Class Period, Defendants sold Spark Plugs directly to OEMs, other manufacturers of internal combustion engines, suppliers to OEMs, distributors and other purchasers.

43.     Defendants and their co-conspirators supplied Spark Plugs to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Spark Plugs (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) in Japan for installation in motor vehicles manufactured in Japan for export to and sale in the United States.

44.     During the Class Period, Defendants, who in a competitive market would be horizontal competitors, engaged in a conspiracy to allocate supply, rig bids for and to raise, fix, maintain, or stabilize prices of Spark Plugs.  As a result of their unlawful conduct, Defendants did not compete, and instead enjoyed business insulated from competition.

## THE CHARACTERISTICS OF THE MARKET
## FOR SPARK PLUGS ARE CONDUCIVE TO COLLUSION

45.     In addition to the NGK Spark Plug Co., Ltd. U.S. guilty plea, Robert Bosch GmbH's U.S. guilty plea and admission that it was in a Spark Plugs cartel with NGK Spark Plug Co., Ltd. in Brazil, and Denso being a major Spark Plugs manufacturer that has pled guilty to price-fixing and bid-rigging of other motor vehicle parts, several important economic characteristics of the market for Spark Plugs render it plausible that there was collusion among the Defendant Spark Plug suppliers.

*High Barriers to Entry*

46.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Therefore, high barriers to entry help facilitate a cartel.

47.     There are high barriers to entry in the market for Spark Plugs.  Entry requires a company to incur significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.

*Price Inelasticity*

48.     When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.  Otherwise, increased prices would result in declining sales, revenues, and profits.

49.     Spark Plugs are required for non-diesel internal combustion engines.  There are no viable substitute products.  Therefore, pricing for Spark Plugs is highly inelastic.

*Opportunities for Collusion*

50.     Defendants attended industry events, fostering opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

**DEFENDANTS' ANTITRUST CONSPIRACY**

51.     During the Class Period, Defendants conspired to rig bids for, allocate the supply of, and to raise, fix and maintain prices for Spark Plugs sold in or into the United States.

10

52.     Defendants and their co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy, as described below.

53.     Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States, Germany and Japan to discuss bids and price quotations for Spark Plugs sold in or into the United States.

54.     Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate the supply of Spark Plugs, and on bids and price quotations and adjustments for Spark Plugs sold in or into the United States.

55.     Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers and other engine manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

56.     Defendants sold Spark Plugs to customers in the United States and elsewhere at collusive and non-competitive prices.

57.     Defendants accepted payments for Spark Plugs sold in the United States and elsewhere at collusive and non-competitive prices.

58.     Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

59.     Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

60.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

61.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple

parts suppliers, (b) the suppliers submit bids, (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (d) the suppliers submit revised bids, and (e) the OEM selects the winner.

62.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

63.     When OEMs purchase Spark Plugs directly from the supplier to whom it awarded the contract, the OEMs purchase the Spark Plugs at the winning price.

64.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Spark Plugs directly from the winning Spark Plugs bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers, who directly purchase Spark Plugs from the winning bidder, pay the winning bidder at least the winning price. The OEM price sets the floor for pricing of Spark Plugs.

65.     Defendants manipulated the RFQ process to accomplish their conspiracy.

66.     As part of their conspiracy, at times Defendants agreed to submit bids that would allow the supplier that had the existing Spark Plugs business for a particular model to win the Spark Plugs business for the successor model.

67.     Further, Defendants coordinated their Spark Plugs pricing.  Defendants submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other.  Defendants exchanged pricing information not just to insure that the agreed-upon party would win the business, but also to insure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

68.     During the class period Defendants communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy.  Defendants' activities included, but were not limited to, the following:

a.      Agreeing to unlawfully coordinate pricing for Spark Plugs and allocate sales of Spark Plugs.  For example, in responding to RFQs, Defendants agreed that the incumbent supplier would be the preferred bidder and to price their bids to effect this agreement;

b.      Colluding with regard to RFQs for Spark Plugs business by agreeing on pricing and then communicating agreed upon prices to Defendants' subsidiaries in the U.S., where the prices were submitted collusively;

c.      Discussing and exchanging pricing information with regard to Spark Plugs RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Spark Plugs pricing before submission to OEMs in the United States and elsewhere.

69.     Defendants and their co-conspirators knew and intended that their actions regarding their sales of Spark Plugs to motor vehicle manufacturers would have a direct impact on prices for Spark Plugs sold to all direct purchasers of Spark Plugs throughout the United States.  Defendants' scheme was implemented, succeeded, and affected the prices for all Spark Plugs.

## UNITED STATES AND OTHER CRIMINAL CHARGES

70.     On August 19, 2014, the DOJ charged NGK Spark Plug Co., Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the

automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, spark plugs, standard oxygen sensors, and air fuel ratio sensors" in violation of Section 1 of the Sherman Act.

71.    According to the criminal Information, NGK Spark Plug Co., Ltd. and its co-conspirators:

a.    participated in meetings, conversations, and communications in Japan and Germany to discuss the bids and price quotations to be submitted to certain motor vehicle manufacturers in the United States and elsewhere;

b.    agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle manufacturers in the United States and elsewhere;

c.    agreed, during those meetings, conversations, and communications, to allocate the supply of Spark Plugs sold to certain motor vehicle manufacturers in the United States and elsewhere on a model-by-model basis or on an engine-specific basis;

d.    agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain motor vehicle manufacturers in the United States and elsewhere;

e.    submitted bids, price quotations, and price adjustments to certain motor vehicle manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.    sold Spark Plugs to certain motor vehicle manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

14

g.  accepted payment for Spark Plugs sold to certain motor vehicle manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and,

h.  engaged in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

72.  Also on August 19, 2014, the DOJ announced that NGK Spark Plug Co., Ltd. had agreed to pay a $52.1 million criminal fine and plead guilty to a one-count criminal information charging it with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of Spark Plugs, oxygen sensors and air fuel ratio sensors in violation of the Sherman Act.

73.  In addition to the criminal fine, NGK Spark Plug Co., Ltd. has agreed to cooperate in the DOJ's ongoing investigation.  NGK stated in its press release on August 19, 2014 that it had cooperated fully with the investigation since July 2011 and strived to enhance compliance with the antitrust laws.  NGK also stated that the representative directors will voluntarily return 30 percent of their compensation for a three month period starting from September 2014 and that it apologized to its customers and other stakeholders.

74.  On September 8, 2014, Bosch announced that it operated a Spark Plug cartel with NGK in Brazil.  Bosch had entered into a leniency agreement regarding its conduct in July 2014 with the Brazilian Administrative Council for Economic Defense.

75.  Bosch has also publically disclosed that it is cooperating with European antitrust authorities investigating motor vehicle parts suppliers.  In South Korea, a Bosch subsidiary has been charged with colluding with Denso with respect to a motor vehicle part.

76.     On October 8, 2014, NGK Spark Plug Co., Ltd.'s Plea Agreement with the United States was filed in the United States District Court for the Eastern District of Michigan, Southern Division.

77.     NGK agreed to plead guilty to participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of spark plugs, standard oxygen sensors, and air fuel ratio sensors sold in the United States and elsewhere, from at least as early as January 2000 until at least July 2011, in violation of the Sherman Antitrust Act, 15 U.S.C. §1."

78.     The Plea Agreement states that "acts in furtherance of the conspiracy were carried out within the Eastern District of Michigan, Southern Division" and "spark plugs that were the subject of the conspiracy were sold to DaimlerChrysler AG, Honda Motor Company, Ltd., Toyota Motor Corporation, and certain of their U.S. subsidiaries by [NGK Spark Plug Co., Ltd.'s] United States subsidiary, which is located in the Eastern District of Michigan."

79.     NGK Spark Plug Co., Ltd. agreed that its subsidiaries, NGK Spark Plugs (U.S.A.) Holding, Inc., NGK Spark Plugs (U.S.A.), Inc. and NTK Technologies, Inc., would fully cooperate with the United States in the prosecution of the Spark Plugs and oxygen sensor cases and the automotive parts antitrust investigation generally.

80.     Four individuals were excluded from the cooperation provision of the NGK Plea Agreement, suggesting that they may be individually charged later with violating United States antitrust laws.

81.     On March 31, 2015, the DOJ announced that "Robert Bosch GmbH, the world's largest independent parts supplier to the automotive industry, based in Gerlingen, Germany, has agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix

prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere….”

82.     According to the Information,  Bosch “and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive and internal combustion engine parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of, spark plugs and oxygen sensors sold to DaimlerChrysler AG, Ford Motor Company, General Motors Company, Andreas Stihl AG & Co. and certain of their subsidiaries in the United States and elsewhere” during the period “from at least as early as January 2000 until at least July 2011” in violation of Section 1 of the Sherman Act.

83.     According to the criminal Information, Bosch and its co-conspirators:

a.     participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain motor vehicle and engine manufacturers in the United States and elsewhere;

b.     agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle and engine manufacturers;

c.     agreed, during those meetings, conversations, and communications, to allocate the supply of Spark Plugs sold to motor vehicle and engine manufacturers in the United States and elsewhere on a model-by-model basis or on an engine-specific basis;

d.     agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain motor vehicle and engine manufacturers in the United States and elsewhere;

e.      submitted bids, price quotations, and price adjustments to certain motor vehicle and engine manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.      sold Spark Plugs to certain motor vehicle and engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.      accepted payment for Spark Plugs sold to certain motor vehicle and engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and,

h.      engaged in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

84.     Denso is one of the world's major manufacturers of Spark Plugs (as well as of many other motor vehicle parts) and it has been ensnared in the DOJ's (and other countries') motor vehicle antitrust investigation.  On January 30, 2012, the DOJ announced that Denso Corporation agreed to plead guilty to a two-count criminal information and to pay a total of $78 million in criminal fines.   Denso Corporation was charged with: (a) participating in a combination and conspiracy to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain electronic control units sold to a motor vehicle manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of §1 of the Sherman Act; and, (b) participating in a combination and conspiracy to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of heater control units sold to a motor vehicle manufacturer in

the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Section1 of the Sherman Act.  On March 5, 2012, Denso Corporation pleaded guilty to these charges.

85.     On January 31, 2012, Denso Corporation issued a news release stating that "to emphasize the seriousness of these matters, Denso Corporation's chairman, president and certain board members and executive directors will voluntarily return 30 percent to 10 percent of their compensation for a three-month period starting in February 2012."

86.     On August 20, 2014, the National Development and Reform Commission of China announced that it had decided to impose monetary sanctions on certain automotive suppliers, including Denso Corporation, for violation of China's Anti-Monopoly Law in connection with sales of "certain automotive components."

87.     On August 21, 2014, Denso announced that it had been fined by the Ontario Superior Court of Justice for the violation of the Canadian Competition Act in connection with sales in Canada of certain body electronic control units for motor vehicles.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs bring this action on behalf of themselves and pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as the representative of a Class defined as follows:

> All direct purchasers of Spark Plugs in the United States from any of the Defendants (or their controlled subsidiaries, affiliates, or joint-ventures) between January 1, 2000 and the present ("the Class").

89.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiffs, it is believed to be in the hundreds.  The identity of the members of the Class can be readily determined from information and records in the possession of Defendants.

90.     Plaintiffs' claims are typical of the claims of the members of the class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Spark Plugs as a result of Defendants' anticompetitive and unlawful conduct.

91.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

92.     Plaintiffs are represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

93.     Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

94.     There are core questions of law and fact common to the Class, such as:

a.      Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, to allocate the supply of, or to rig bids for, Spark Plugs;

b.      The participants in and duration of the conspiracy;

c.      Whether the conspiracy caused Spark Plugs prices to be higher than they would have been in the absence of Defendants' conduct;

d.      Whether Defendants' conduct caused injury to the business or property of Plaintiffs and members of the Class;

e.      Whether Defendants' conduct violates Section 1 of the Sherman Act;

f.      Whether Defendants undertook actions to conceal their unlawful conspiracy; and,

g.      The appropriate measure of the amount of damages suffered by the Class.

95.     A class action is superior to the other methods available for the fair and efficient adjudication of this litigation since individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFFS AND THE CLASS

96.     Defendants' anticompetitive conduct has had the following effects:

a.      price competition has been restrained, suppressed, or eliminated with respect to Spark Plugs;

b.      the prices of Spark Plugs have been raised, fixed, maintained, or stabilized at supra-competitive levels; and,

c.      purchasers of Spark Plugs have been deprived of free and open competition in the Spark Plugs market.

97.     As a result of the contract, combination, or conspiracy, Plaintiffs and Class members paid anticompetitive and higher prices for Spark Plugs than they would have in the absence of the conspiracy, and Plaintiffs and Class members have sustained injury to their business or property.

## PLAINTIFFS' CLAIMS ARE TIMELY

98.     Plaintiffs incorporate by reference the allegations set forth above and adopt same as though fully set forth herein.

99.     Defendants' conduct persisted for at least eleven years (2000-2011).   Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that Defendants' conspiracy would have continued undetected.

100.     Plaintiffs and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least August 19, 2014, at the earliest.   As a result, Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least August 19, 2014, at the earliest.

101.     No information in the public domain was available to Plaintiffs and the members of the Class prior to August 19, 2014, when the DOJ announced the guilty plea of NGK Spark Plug Co., Ltd.   Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in a Spark Plugs conspiracy.   For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run until at the earliest August 20, 2014 with respect to the claims that Plaintiffs and the members of the Class have alleged in this Complaint.

102.     Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class until at least August 19, 2014.   Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as January 2000 through at least August 19, 2014. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

103.    Before at least August 19, 2014, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for Spark Plugs during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Class that would have suggested to Plaintiffs that they were being injured by Defendants' unlawful conduct.

104.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

105.    By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Spark Plugs are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Class reasonably considered it to be a competitive industry.  Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

106.    Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid rigging, customer allocation, and price-fixing activities.

107.    Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

108.    In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

109.    During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

110.    Defendants likewise agreed to allocate the supply of Spark Plugs sold to customers in the United States and elsewhere on a model-by-model basis.

111.    Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

112.    In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

113.    Plaintiffs and the members of the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

114.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims were tolled and did not begin to run until at least August 20, 2014.

## COUNT I: CLAIM FOR VIOLATION OF THE SHERMAN ACT

115.    Plaintiffs incorporate by reference the allegations set forth above and adopt same as though fully set forth herein.

116.    Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act.

117.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

118.    Commencing at least as early as January 2000 and continuing until the present, the exact dates being currently unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Spark Plugs, creating anticompetitive effects.

119.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Spark Plugs throughout the United States.

120.    As a result of the conspiracy alleged herein, the prices charged to Plaintiffs and members of the Class for Spark Plugs were unlawfully raised, fixed, maintained, or stabilized in the United States.

121.    The conspiracy has had the following effects:

a.    prices paid by Plaintiffs and members of the Class for Spark Plugs were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.    Plaintiffs and members of the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Spark Plugs; and,

c.    competition in the market for Spark Plugs has been unlawfully restrained, suppressed, or eliminated.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been damaged and will continue to be damaged by paying supra-

competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

123.    The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this Complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §§1, 3;

C.    That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.    That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.        That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and,

G.        That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: May 18, 2015                          /s/ David H. Fink_____
                                                             David H. Fink (P28235)
                                                             Darryl Bressack (P67820)
                                                             FINK + ASSOCIATES LAW
                                                             100 West Long Lake Road; Ste. 111
                                                             Bloomfield Hills, MI 48304
                                                             Telephone: (248) 971-2500
                                                             dfink@finkandassociateslaw.com
                                                             dbressack@finkandassociateslaw.com

                                                             Joseph C. Kohn
                                                             William E. Hoese
                                                             Douglas A. Abrahams
                                                             KOHN, SWIFT & GRAF, P.C.
                                                             One South Broad Street, Suite 2100
                                                             Philadelphia, PA 19107
                                                             Telephone: (215) 238-1700
                                                             jkohn@kohnswift.com
                                                             whoese@kohnswift.com
                                                             dabrahams@kohnswift.com

                                                             Gregory P. Hansel
                                                             Randall B. Weill
                                                             Michael S. Smith
                                                             PRETI, FLAHERTY, BELIVEAU
                                                                 & PACHIOS LLP
                                                             One City Center
                                                             P.O. Box 9546
                                                             Portland, ME 04112-9546
                                                             Telephone: (207) 791-3000
                                                             ghansel@preti.com
                                                             rweill@preti.com
                                                             msmith@preti.com

27

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
   & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Carl E. Person
225 E. 36th Street – Suite 3A
New York, N.Y. 10016-3664
Telephone: (212) 307- 4444
carlpers2@gmail.com

Linda P. Nussbaum
Susan R. Schwaiger
Nussbaum Law Group, P.C.
570 Lexington Avenue, 19th Floor
New York, NY 10022
Telephone: (212) 702-7053
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481

Warren Rubin
Law Offices Bernard M. Gross, P.C.
John Wanamaker Building,
100 Penn Square East, Suite 450
Philadelphia, PA 19107
Telephone: (215) 561-3600

*Counsel for Plaintiff WAL, Inc. d/b/a Tri-State Automotive Warehouse, KMB/CT, Inc. d/b/a/ KMB Warehouse Distributors Inc. and the Proposed Class*